UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:16-cv-106-FDW

| DEREK SHANE GOODSON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| LT. FNU SHARP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** comes before the Court on (1) a motion for summary judgment filed by Defendant Maureen Sharp, (Doc. No. 33), and (2) a motion for summary judgment filed by Defendants Rebecca Gray, FNP, and Misty Sneed, RN, (Doc. No. 34), collectively referred to as the "Medical Defendants."

### I. BACKGROUND

#### A. Procedural Background

Pro se Plaintiff Derek Goodson is a North Carolina prisoner currently incarcerated at Central Prison in Raleigh, North Carolina. He was formerly incarcerated at the Graham County Detention Center in Robbinsville, North Carolina, but he was transferred at times to the Cherokee County Detention Center in Murphy, North Carolina, to receive medical services.

On April 20, 2016, Plaintiff filed this action under 42 U.S.C. § 1983, alleging claims against moving Defendants Maureen Sharp, Rebecca Gray, and Misty Sneed for deliberate indifference to a serious medical need based on medical care he received while at the Cherokee

1

County Detention Center ("the detention center").¹ (Doc. No. 1 at 3-4). Plaintiff alleges that Defendant Gray, a family nurse practitioner providing medical services at the detention center, cut his dosage of gabapentin in half, in essence to make him "suffer" since she was allegedly advised by Defendant Sneed, a detention center nurse, of the charges for which Plaintiff was in jail.² (Id.). Plaintiff has also named as a Defendant Lieutenant Sharp, an employee of the detention center at all relevant times, but Plaintiff does not allege any facts indicating how he contends that Sharp contributed to the deliberate indifference to his serious medical needs. (Id.).

On May 19, 2017, Defendants filed the pending summary judgment motions. (Doc. Nos. 33, 34). On May 31, 2017, this Court entered an order, in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could be submitted to the Court. (Doc. No. 36). Plaintiff has not filed a response to the summary judgment motions, and the time to do so has passed.³

**B.    Factual Background**

**1.    Plaintiff's Allegations**

Because Plaintiff has not responded to either pending motion, the Court has before it on summary judgment only the original allegations in his Complaint. In his Complaint, Plaintiff

---

[1] Plaintiff also sued Edward Cable, a Graham County Sheriff's office employee, but the Court dismissed the claims against him for Plaintiff's failure to perfect service. (Doc. No. 31).
[2] Defendant Gray began providing medical services at the detention center in November 2015 (after Plaintiff was already detained), pursuant to a contract with Southern Health Partners, Inc. ("SHP"). (Doc. No. 35-1 at ¶¶ 1, 2). Defendant Sneed is a registered nurse, who was formerly employed by SHP and worked under Gray's supervision in the medical department of the detention center's medical department at all relevant times. (Id.).
[3] Because Plaintiff did not file a response to the summary judgment motions, he is deemed to have abandoned his claims. See Crosby v. Gastonia, 635 F.3d 634, 637 n.3 (4th Cir. 2011). In an abundance of caution, however, the Court will address the merits of Plaintiff's claims.

alleged that he was born with bilateral club feet and had numerous surgeries on his feet during his life. (Doc. No. 1 at 3). Plaintiff asserts that he had been taking 3600 mg of gabapentin for fourteen years for pain before his detention, which medication had been prescribed to him by his prior medical providers. (Id.). Plaintiff alleges that Gray reduced this dosage from 3600 mg per day to 1800 mg per day. (Id. at 3-4). He also alleges that Gray did so because Nurse Sneed allegedly "asked what [his] charges were then she relayed that to Doctor Gray and she cut it in half." (Id.). Plaintiff alleges that this constitutes deliberate indifference, and he requests that the detention center dispense gabapentin to him at 1200 mg three times a day (i.e., a total of 3600 mg per day) and arrange for him to return to see a foot specialist (a podiatrist) and that he receive other types of injunctive and compensatory relief sought in his Complaint. (Id. at 4).

2. **Defendants' Summary Judgment Evidence**

Defendants' summary judgment materials include the Affidavit of Defendant Gray, Plaintiff's relevant medical records, the Declaration of non-party Mark Patterson, the Declaration of defense counsel Sean Perrin, and the Declaration of Defendant Sharp. Specifically, Gray's affidavit and the attached medical records provide further information, explanation, and clarification as to the reduction in dosage of gabapentin. See (Doc. No. 35-1: Gray Aff.). Defendant Gray attests that she indeed reduced the dosage from 3600 mg per day to a total of 1800 mg per day. She explains, however, that she did so based on medical information about the drug and her concerns as to the potential side effects on Plaintiff's health, especially since he was taking multiple other medications. (Id. at ¶¶ 3-5). More specifically, Gray explains that gabapentin, which is marketed under the brand name Neurontin, is indicated for two usages—the management of postherpetic neuralgia in adults and adjunctive therapy in the treatment of partial onset seizures in persons who have epilepsy. (Id. at ¶ 3). While Plaintiff did not have either of

3

these conditions, gabapentin is also used by some medical providers to treat neuropathic pain. (Id.).

The maximum recommended daily dose of gabapentin for postherpetic neuralgia is 1800 mg. (Id.). Gray notes that in, clinical studies, additional benefit of using doses greater than 1800 mg per day for postherpetic neuralgia was not demonstrated. (Id.). Furthermore, antiepileptic drugs such as gabapentin have been shown to increase the risk for suicidal thoughts or behavior in some patients taking these drugs for any indication. (Id.). Gabapentin has also been reported to cause the side effects of somnolence, sedation, and dizziness in some patients during controlled drug trials, and side effects of dizziness and somnolence were reported at a greater rate where dosages of up to 3600 mg per day were given. (Id.).

Gray explains that, based on this drug information, she was concerned that exceeding the 1800 mg maximum recommended daily dose for gabapentin was not providing additional benefits to Plaintiff, but was potentially increasing the risk for negative side effects for him, especially in light of the multiple other drugs he was taking. (Id. at ¶¶ 3, 5). As of September 18, 2015, Plaintiff was taking, on a daily basis (1) Levothyroxine Sodium, a thyroid medication; (2) Sertraline, an anti-depressant; (3) Gabapentin; (4) Amitriptyline, another antidepressant (and also helps with pain); and (5) Naproxen, a nonsteroidal, anti-inflammatory drug. (Id. at ¶ 4, and Ex. A, at SHP000004). Given the number of these medications, Gray's concerns regarding the amount of gabapentin being taken at the time (double the recommended dosage), and the potential for negative side-effects, Gray adjusted the dosage to the maximum recommended daily dosage of the drug, 1800 mg per day. (Id. at ¶ 5). Thus, Gray used her medical judgment to reduce what she believed (and what her understanding of the drug information indicated) was an excessive dose, in the interest of Plaintiff's health. (Id.).

4

As to Defendant Sneed, the only evidence on summary judgment is that Defendant Sneed, who is a registered nurse (and as such is not authorized to prescribe medications herself), simply carried out the administration of the medications that were ordered by Gray. The record also establishes that Nurse Sneed and Gray explained the reduction in dosage of the gabapentin to Plaintiff, in an effort to help him understand the reasons for the reduction. (Id. at ¶¶ 5, 7). Gray also tried to work with Plaintiff to reach an acceptable and satisfactory dosage. (Id. at ¶ 5). For instance, after decreasing the gabapentin on a trial basis to 600 mg twice a day (1200 mg total), Gray increased it up to 900 mg twice a day (1800 mg total) because Plaintiff had expressed concern. (Id.). Gray also allowed Plaintiff to continue on the Amitriptyline medication to assist with pain relief, even though Amitriptyline was also a sedating drug (which was another reason Gray was concerned about the high dosage of gabapentin, since it was in combination with another sedating drug). (See id.).

Arrangements were also made for Plaintiff to see a number of outside medical providers, including a foot specialist (a podiatrist), Dr. Davis, in Waynesville, North Carolina. (Id. at ¶¶ 6-7 & Ex. A, at SHP000057-000102). Dr. Davis prescribed two additional medications for Plaintiff (luliconazole 1% topical cream and Mobic 15 mg oral tablet), which the Medical Defendants administered as prescribed, and gabapentin at the prior dosage of 3600 mg. Despite that Dr. Davis prescribed gabapentin at the prior dosage of 3600 mg, Gray asserts that she maintained Plaintiff's gabapentin prescription at the maximum daily dosage of 1800 mg a day for the reasons discussed above. (Id. at ¶ 7). Gray further notes that Dr. Davis did not "order" the medical staff at the detention center to provide Plaintiff with any particular dose of gabapentin. (Id.). Gray explains that, while Dr. Davis may have felt comfortable administering the higher dose, Gray was responsible for reviewing all prescriptions and determining what was

5

appropriate to be administered in the detention center, and she adds that Dr. Davis would not be available if an issue arose with Plaintiff at the detention center. (See id.).

Finally, Gray attests that neither Nurse Sneed nor anyone else ever told her what criminal charges were brought against Plaintiff, and she asserts that she still does not know what charges he was detained for. (Id. at ¶ 9). Moreover, Gray affirms under oath that any such information would never enter into any treatment or other medical decision that she makes concerning a detainee's care. (Id.).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the

6

nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. DISCUSSION

#### A. Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs As to the Medical Defendants

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at

7

106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety."[4] Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's Section 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

Here, the record is entirely devoid of any evidence of deliberate indifference to a serious medical need by the Medical Defendants Dr. Gray and Nurse Sneed. While Plaintiff's Complaint focuses on Gray's decision to decrease the dosage of his gabapentin, the record reflects that, even with the reduction, Plaintiff was still receiving the maximum recommended daily dosage of the drug, 1800 mg per day.[5] (Doc. No. 35-1 at ¶¶ 3-5). He was also receiving

---

[4] While Farmer dealt with the Eighth Amendment, the standard for both convicted prisoners under the Eighth Amendment and pretrial detainees under the Fourteenth Amendment is the same. Brown v. Harris, 240 F.3d 383, 388 (4th Cir. 2001).

[5] Plaintiff does not question the rest of his care at the detention center. Moreover, Gray's affidavit and the medical records attached to it establish that Plaintiff received care for numerous reported conditions at the detention center and was transported to see medical providers outside

8

four other daily medications, two of which were antidepressants (Sertraline and Amitriptyline, the latter of which also helped with pain but caused sedation like gabapentin), and Naproxen (for inflammation and pain). See (Id. at ¶¶ 4-5). In addition to medications, Plaintiff received nurse visits, care from Gray, and outside medical and hospital visits as needed. See (Id. at ¶¶ 5-7 & Ex. A, at SHP000001-000007, SHP000023-000027, SHP000031-000034, SHP000038-000049, SHP000057-000102, & SHP000103-000151). These numerous actions and efforts by the Medical Defendants do not plausibly constitute "deliberate indifference" under the law, particularly in light of Gray's detailed explanation of the medical reasons for her decision. Even though Plaintiff wanted to continue taking a dosage of 3600 mg per day, Gray explained that the drug information and studies did not indicate additional benefits from using a high dosage (twice the recommended maximum dosage of 1800 mg), and showed the potential for increased negative side effects. (Id. at ¶¶ 3-5). Plaintiff was already taking multiple other medications, some of which had similar side effects to gabapentin. (Id. at ¶¶ 4-5). Gray did not believe it was in the best interest of Plaintiff's overall health to continue administering such a high dosage, especially in light of the multiple other medications Plaintiff was taking. (Id. at ¶¶ 5, 7-8). Where, as here, a medical provider makes a decision based on her medical judgment, there is no deliberate indifference as a matter of law. See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) ("Questions of medical judgment are not subject to judicial review."); see also Staples v. Va. Dep't of Corrs., 904 F. Supp. 487, 493 (E.D. Va. 1995) ("The court will not second guess medical opinions regarding what is or is not appropriate medical care"). Finally, with regard to

---

the detention center and to local hospitals when needed. See (Id. at ¶¶ 5-7 & Ex. A, at SHP000001-000007, SHP000023-000027, SHP000031-000034, SHP000038-000049, SHP000057-000102, & SHP000103-000151). They reflect that Plaintiff received substantial, continuous, and responsive care by the Medical Defendants at the detention center. (See id.).

Nurse Sneed, there is no evidence that she did anything other than administer the medication as ordered by Gray. See (Doc. No. 35-1 at ¶ 1 & Ex. A, at SHP000001-000003, SHP000023-000026, SHP000041-000045, SHP000131).

While the foregoing, alone, requires a ruling in favor of the Medical Defendants on summary judgment, Plaintiff has also failed to raise a genuine issue of dispute as to other elements of his deliberate indifference claim. First, Plaintiff has failed to demonstrate any evidence of "substantial harm" as a result of the Medical Defendants' actions. See Staples, 904 F. Supp. at 492 (stating that "even assuming plaintiff's allegations are accurate, he has failed to show any serious harm as a result of the alleged violations"). While Plaintiff may have had higher dosages of gabapentin prescribed in the past, he has presented no medical or expert evidence to show that receiving the maximum daily dosage of gabapentin, 1800 mg, rather than the higher dosage of 3600 mg, caused him any substantial harm or a deterioration of any serious medical condition.[6] To the contrary, as noted, Gray attests that she believes gabapentin in excess of the 1800 mg per day recommended amount was not helpful to Plaintiff, but had the potential for harmful side-effects, particularly where his other daily medications are taken into consideration. (Doc. No. 35-1 at ¶¶ 3-5). With regard to Nurse Sneed, there is no evidence that she had anything to do with the decision to reduce the gabapentin and, in fact, as a nurse she could not do so but could only carry out medication orders from Gray.

In addition, Plaintiff has failed to establish that the Medical Defendants had the requisite state of mind to establish "deliberate indifference" under the law. Deliberate indifference

---

[6] Any allegations to the contrary are unsupported in light of the record, particularly where Plaintiff himself refused sick calls on several occasions on or about February 25, 2016, and March 6, 19, & 25, 2016. See (Doc. No. 35-1, Ex. A, at SHP000046-0000049, and SHP000108).

describes a state of mind more blameworthy than negligence, requiring (1) that a defendant have been personally aware of facts from which the inference could be drawn that Plaintiff would suffer a substantial risk of serious harm; and (2) that the defendant had actually drawn the inference and recognized the existence of such a risk. Farmer, 511 U.S. at 837. A prison official is not liable if he knew the underlying facts but believed, even if unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent. Farmer, 511 U.S. at 837.

While Plaintiff alleged in his Complaint that Gray reduced the dose of gabapentin because Nurse Sneed learned of Plaintiff's charges and then relayed them to Gray, this conclusory allegation is wholly unsupported by any actual evidence. Gray's affidavit attests that neither Nurse Sneed nor anyone else ever told her what criminal charges were brought against Plaintiff. (Doc. No. 35-1 at ¶ 9). Gray further asserts that, even now, she does not know Plaintiff's charges, and she further affirms that no such information would ever enter into a treatment or medical decision. (Id.).

In sum, for the reasons stated herein, Defendants Gray and Sneed are entitled to summary judgment on Plaintiff's deliberate indifference claim as to them.

**B. Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs As to Defendant Sharp**

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust his administrative remedies before filing a Section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion

requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524).

Defendant Sharp's summary judgment evidence shows that at the time of Plaintiff's incarceration, the Sheriff's Office had a formal written policy concerning inmate grievances. (Doc. No. 33-2 at ¶ 3: Patterson Decl.). On October 27, 2015, Plaintiff received an inmate handbook, which describes grievance procedures at the detention center. (Id. at ¶¶ 4-5). The detention center's grievance policy provides that, if an inmate is unable to informally resolve an issue concerning conditions of his or her confinement, the inmate may file a grievance. (Id. at ¶ 3). Captain Mark Patterson, the detention center's administrator, reviews the grievances and if he determines that an investigation is warranted, requests that an independent jail employee investigate the grievance. (Id.). In support of the summary judgment motion, Sharp contends that Plaintiff has not exhausted his remedies through the detention center's grievance policies. As set forth in Patterson's declaration, Plaintiff filed seven grievances, but none any against

12

Sharp.  (Id. at ¶¶ 8-9, Ex. D).

Plaintiff also failed to respond to Sharp's Request for Admissions.  Fed. R. Civ. P. 36 states that a matter is admitted unless, within 30 days after service of the request, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection.  Defendant's requests for admission asked Plaintiff to admit that there was a grievance procedure at the Detention Center, and that he did not file a grievance against Sharp.  (Doc. No. 33-3 at ¶ 1: Perrin Dec., Ex. A).  Defendant Sharp contends, and this Court agrees, that because Plaintiff failed to respond to Defendant's request for admissions, he has admitted that he did not file a grievance against Sharp.  See Whiting v. Weslowski, 200 F.R.D. 263, 264-65 (E.D.N.C. 2000) (deeming the unanswered request for admissions admitted even though the plaintiff was pro se); Cotton v. Evanston Ins. Co., No. 1:09cv504, 2011 WL 6663609, at *2 (M.D.N.C. Dec. 21, 2011) (unpublished) ("[U]nder Fed. R. Civ. P. 36(a)(3), [the pro se] [p]laintiff's failure to respond to Defendant's Requests for Admissions in a timely fashion has resulted in the de facto admission of the facts contained therein.").

In court filings, Plaintiff also admitted his failure to file any grievances against Sharp.  In his statement concerning exhaustion of remedies, Plaintiff attached four grievances, none of which name Sharp, or otherwise put Sharp on notice of his claim against her.  (Doc. No. 10).  On December 19, 2016, in response to Defendant's affirmative defense of failure to exhaust administrative remedies, Plaintiff informed the Court that he submitted all the grievances relating to this case.  (Doc. No. 24).  As Sharp has demonstrated that Plaintiff has failed to exhaust his administrative remedies under the PLRA by compliance with the detention center's grievance policy, his Section 1983 claim against Sharp must be dismissed.

In any event, for the same reasons that the Medical Defendants are entitled to summary

13

judgment, Defendant Sharp is also entitled to summary judgment because Plaintiff has not presented evidence on summary judgment raising a genuine issue of material dispute as to his deliberate indifference claim against her. Here, the detention center contracted with Southern Health Partners to provide medical care to inmates. (Doc. No. 33-4 at ¶ 3: Sharp Decl.). None of the officers at the detention center, including Sharp, provided any medical care or made any medical decisions. (Id. at ¶ 6). Sharp relied on the detention center's medical staff to provide inmates with medically necessary and appropriate medications. (Id.). When passing out medications to inmates, the detention center staff administers the dosage as prescribed by medical staff. (Id. at ¶ 7). The detention center staff cannot change a prescription because they are not licensed medical professionals. (Id.). In fact, Sharp believed that Plaintiff was being provided with the proper medical care, and had no information to the contrary. (Id. at ¶ 9). She also did not perceive that Plaintiff was at any risk of harm as a result of the medication dosage prescribed to him by the detention center's medical staff. (Id.).

It is well settled that a jail official's "failure to take further action once he had referred the matter to the medical providers can[not] be viewed as deliberate indifference." Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005). Here, Sharp was entitled to rely on the opinions of the detention center's medical professionals regarding Plaintiff's prescriptions, absent some evidence that she otherwise knew about and disregarded an excessive risk to an inmate's health and safety. Plaintiff has presented no such evidence in this case. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (stating that officials are entitled to rely on the judgment of medical personnel); Shelton v. Angelone, 148 F. Supp. 2d 670, 678 (W.D. Va. 2001) ("Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment."); Strange v. O'Brien, No. 7:10cv151, 2010 WL 8750304, at *4 (W.D. Va. July 30, 2010) ("Without any

medical expertise of his own, however, [the non-medical defendant] rightfully relied on the professional judgments of his medical staff as to the appropriate course of treatment for [the plaintiff's] injured foot, and in so doing, was not deliberately indifferent to a risk of harm known to him."). In sum, for the reasons stated herein, even if Plaintiff had exhausted his administrative remedies as to Defendant Sharp, his deliberate indifference claim against Defendant Sharp would be subject to dismissal on the merits.

## IV. CONCLUSION

In sum, for the reasons stated herein, the Court grants the summary judgment motions by Defendants.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motions for Summary Judgment, (Doc. Nos. 33, 34), are **GRANTED**, and this action is dismissed.

2. The Clerk is respectfully instructed to terminate this action.

Signed: November 17, 2017

Frank D. Whitney
Chief United States District Judge